871 So.2d 1240 (2004)
STATE of Louisiana
v.
Bruce E. BROWN.
No. 2003-KA-1616.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 2004.
*1241 Eddie J. Jordan, Jr., District Attorney, David M. Abdullah, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
William R. Campbell, Jr., Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
*1242 (Court composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS SR., Judge LEON A. CANNIZZARO Jr.).
DENNIS R. BAGNERIS SR., Judge.
On September 5, 2002 the State filed a bill of information charging the defendant with the burglary of an inhabited dwelling, a violation of La. R.S. 14:62.2. On October 8, 2002 he pleaded not guilty. On October 24, 2002 the trial court found probable cause. On November 6, 2002 the defendant filed a motion to dismiss. On November 11, 2002 he withdrew his pro se motion to dismiss.[1] On November 20, 2002 a jury found the defendant guilty as charged. On January 28, 2003 the State filed a multiple bill charging the defendant as a triple offender, and he pleaded not guilty. On February 27, 2003 the State withdrew the multiple bill. The trial court ordered a pre-sentence investigation. On June 23, 2003 the court denied defense motions for a new trial and for a post verdict judgment of acquittal. The trial court sentenced the defendant to twelve years at hard labor to run consecutively to any other sentence with the first year to be served without benefit of probation, parole, or suspension of sentence; the court indicated that the defendant was to serve the entire twelve years, and he was not to be placed on probation. The court denied the defendant's request to be recommended for a DOC drug rehabilitation program. The trial court denied the motion to reconsider sentence and granted the motion for appeal.

STATEMENT OF FACT
On November 20, 2003 the State put on the record that the defendant, who was to be multiple billed as a third offender, was offered a plea bargain to being a second offender and turned down the offer.
Detective Alfred Celestine testified that on March 28, 2002 he was on the night watch (from 11:00 p.m. to 7:00 a.m.) in the Fischer Housing Development in Algiers. He said that at 11:34 p.m. he responded to a burglary call from 2346 Somerset. When he arrived at the scene about 11:39 p.m., three white males were holding down a black male suspect sitting on a red bicycle with a brown purse slung over his shoulder. A host of neighbors were pointing in their direction. The suspect was struggling to get away. The detective handcuffed the black male in order to find out what was going on. Detective Celestine stated that he spoke to Gary Ballinger, a neighbor from across the street, Rick McCarty and his wife, Patricia, the residents of the house that was burglarized. In Mr. McCarty's front yard on the grass, the detective found computer accessories, some CDs, CD ROMs, a computer system in a bag, a bunch of wires, and some movies. Mr. McCarty said that the items belonged to him. Detective Celestine advised the defendant that he was under arrest and searched his pockets. The detective found a screwdriver, two pocket knives, a flashlight, and a red and black bag. He said that the bike was also taken as evidence. The detective called out the crime lab, and photographs were taken. He identified the photographs at trial. The defendant complained of a leg injury; therefore, the detective relocated him to Charity Hospital where he was treated and released. Detective Celestine identified the defendant in court.
On cross-examination the detective stated that the defendant was lying partially *1243 on top of the bike on the grass between the sidewalk and the street when the officer arrived at the scene. The red bag was sticking out of the back side of the defendant's jeans. A black case was near the defendant on the ground. Detective Celestine said that the crime lab technician moved the items before the photographs were taken. He did not recall any fingerprint dusting. The detective admitted that he did not see the defendant inside any residence or in possession of the black bag full of items. The black bag was on the ground. He stated that the empty red bag was on the defendant's person, and the brown purse was around his neck.
Detective Mark Bonvillian testified that he was part of the investigative team. His job was to interview the subject being held at the scene. When he arrived, he noticed the defendant in handcuffs in the back seat of a police unit, a bicycle on the ground, and some property, which had been taken from a residence in the area, lying on the ground next to the bicycle. He could not recall the color of the bike. There were also some tools, a flashlight and a screwdriver, on the ground. The detective identified a number of the photographs. He did not inspect or enter the residence.
On cross-examination Detective Bonvillian admitted that he did not see the defendant in any residence or the property in the defendant's possession.
Mrs. Patricia McCarty, who resided at 2346 Somerset Street, testified that on the night of March 28, 2002, she was lying on the floor in her residence watching television waiting for her daughter, who was out that night. Her daughter arrived and went to bed. Her husband was sleeping, and she drifted off to sleep. Mrs. McCarty stated that her dog started barking, and she woke up. She heard talking outside on the street and then screaming. She woke up her husband, Rick, who started to put on clothes. She opened the front door, and one of her neighbors, who was crossing in front of her residence, told her to call 911. She complied, but did not know what to tell the 911 operator because she did not know what was happening. The operator told Mrs. McCarty that an officer was already on his way there. She said that she went outside and saw a man being held down by Ballinger, who lived across the street, and his friend. The two were screaming. The subject said that he did not know what was happening; he was riding his bike, and the two men jumped him.
Mrs. McCarty said that the brown purse around the subject's neck belonged to her, and Rick identified the computer bag. Her husband told her to look at the sliding glass door; it was open. Mrs. McCarty said that she then realized that someone had been inside the house. She stated that her daughter arrived home at 10:55 p.m.; she checked the clock. When the dog started barking, Mrs. McCarty said that she got up, went to the restroom, and went to bed. After that she began to hear the noises outside. She did not hear anything before the noises on the street. However, Mrs. McCarty explained that there was an air purifier in the bedroom that was very loud. She said that Tommy, her neighbor to the side who was an arson investigator, told her to call 911. When she went outside, she saw the red bike, the subject, and eventually her husband's computer pack. She also saw her purse around the subject's neck. Mrs. McCarty identified the defendant as the subject being held down; she stated that she did not give him authority to enter her home. Mrs. McCarty admitted that she did not see the defendant inside her home, and she saw him in possession of only her purse around his neck.
*1244 Officer Karl Palmer, the crime lab technician, testified that he took the photographs on March 28, 2002, but he did not dust for fingerprints because there was no suitable surface to test for fingerprints. The glass doors were moist with dew, and inside the perpetrator picked up the computer bag and did not touch other items in the house. The victim showed Officer Palmer what had been disturbed, and there were no surfaces suitable for the lifting of fingerprints. Additionally, fingerprints are usually used to try to identify the perpetrator, but in this case the burglar had been caught right outside the house. On cross-examination he admitted that the defendant had not been caught inside the house. Defense counsel offered Officer Palmer as an expert in the collection of fingerprints, and the court so stipulated. Counsel again attempted to ask if it was possible that the perpetrator may have touched some individual item of furniture inside the McCarty residence. The court noted that the question still required speculation. Officer Palmer stated that he decided not to take fingerprints, not based on his expertise and experience, but upon the fact that the glass doors were wet and nothing was out of place inside. The officer stated that he took items from the bag in order to show the contents of the bag taken from the residence in the photograph.
Rick McCarty testified that he went to bed about 9:30 p.m. and was sleeping on the night of March 28, 2002. He said that he was sleeping in the bedroom at the front of the house. He was rudely awakened by his wife saying that someone was screaming outside. He said that he put on clothes and went outside to investigate. His neighbor, Gary, from across the street, and Gary's friend were holding down a man (with something around his neck) next to a bike and knapsack. After he was told what was happening, he recognized the knapsack as his computer bag (with a yellow tag containing his name). The thing around the man's neck was his wife's purse. Mr. McCarty identified the items from the photographs. He did not know the bicycle. He said that his computer was kept in the back room addition to the house, and his wife's purse was in that room as well. He denied giving the defendant permission to enter his house or to take those items. He identified the defendant in court.
On cross-examination Mr. McCarty admitted that he did not see the defendant inside his house or in possession of the blue knapsack. He said the bag was next to the defendant's bike on the ground.
Gary Ballinger, the neighbor across the street, testified that he worked part-time as an assistant manager for a yogurt store. On March 28, 2002 (Holy Thursday), he closed the store at 10:00 p.m. His mother had been waiting for him in the parking lot. A friend had arrived from Baton Rouge, and the two were talking outside the store. Mr. Ballinger suggested that the friend go back to Mr. Ballinger's house with him. He stopped at a grocery store and arrived home about 10:30 p.m. When he pulled into his driveway, there was a red bike leaning against a tree in his front yard. As he entered his house, Mr. Ballinger saw that things had been moved around. A door to an addition, which was always locked, was wide open. He ran outside, and the bike was gone. Mr. Ballinger called the non-emergency number to the police (because he was not in danger) and asked that a unit be dispatched. He and his friend waited outside from 10:40 p.m. until close to midnight when he saw the red bike approach the McCarty residence. The rider leaned the bike against one of the McCarty cars. Mr. Ballinger said that he did not know the rider of the bike and had never seen him before. He *1245 went inside and asked his mother to call 911. Mr. Ballinger stated that he and his friend then saw a flashlight inside the McCarty window, and they realized that the man was no longer by the bike, but inside the house. He and his friend went over and moved the bike to the other side of the yard to make it more difficult for the perpetrator to leave. When the man exited the house, he had some things in his hand. Mr. Ballinger stayed a distance away and asked what was going on. The man answered that he was on his way from class and had to stop to relieve himself before he made his way home. That explanation increased Mr. Ballinger's suspicions. The man ran for the bike, and Mr. Ballinger stayed at a distance until both of the perpetrator's hands were on the bike. Then he and his friend jumped the man on his bike and tackled him. It took the police officers about ten minutes to respond. Mr. Ballinger said that he and his friend struggled to keep the man/defendant from escaping. He had the defendant by the neck, and his friend had the defendant by the leg. The defendant screamed that he was being hurt, but he would not stop struggling despite Mr. Ballinger's instructions to do so. The struggle occurred near the street by the McCarty driveway. Mr. Ballinger identified a number of photographs. He absolutely identified the defendant as the man attempting to escape on the bike. He said that there was no doubt in his mind.
On cross-examination Mr. Ballinger admitted that he did not see the defendant enter the McCarty house. However, he stated that he did see the defendant exit the house. From his vantage point, he could see if anything exited the sliding glass door. He admitted that he did not see the defendant cross the threshold from inside the house; however, the only explanation other than the defendant exiting the house would have been that he appeared out of thin air. Mr. Ballinger first saw the defendant on the side of the McCarty house. He could not say that he saw the defendant coming from inside the house.
The defendant testified that he had recently arrived (less than a week) in the city from Mississippi. He was living at 1426 Lawrence Street, which was directly behind the Fischer Housing Development. He had gone to a Bible study group, and he was trying to find his way home that night. The defendant said that he had to find General Meyer and then Whitney Avenue. He stated that he thought General Meyer was right ahead, and he needed to relieve himself. He slowed down to stop to find a place to relieve himself before reaching the busy General Meyer Street. The defendant claimed that he walked back to what he thought was a field, but it turned out to be a fence line between two houses. He used the spot anyway, and then returned to his bike, but it was not there. When he located the bike, he went toward it, but some people were screaming from across the street. The defendant said he retrieved his bike and started to leave. He stated that he was then attacked. He explained that he was a Vietnam veteran with a lot of metal in one leg. One of the attackers grabbed his leg, and the other put something around his neck and choked him. They accused him of being in the house. The defendant said that he was riding a bike, which belonged to his friend, Deidra, whom he had met at church the preceding Sunday. He was carrying a bag with a screwdriver and a flashlight because his friend, Deidra, had asked him to fix the brakes on her bicycle. His keychain had a combination knife and file and other things on it. He said that there was a bag there on the ground, but he was never in possession of the bag. He denied ever entering the residence at 2346 Somerset. The defendant admitted that *1246 he had prior convictions. He said that after the Vietnam War he suffered from post-traumatic stress syndrome. In 1994 he became involved with drugs. He was charged with a drug violation relating to cocaine. In 1997 he was charged with burglary of tools (taken from a shed). He said that he did not burglarize the McCarty residence; he was just in the wrong place at the wrong time.
On cross-examination the defendant stated that he caught a ride with someone to Deidre's apartment where the study group was being held. Deidra let him use her bicycle and gave him instructions to where he was residing. He followed the instructions. When he saw that he was approaching General Meyer, which he knew to be a busy street, he decided to stop before that street to relieve himself. The defendant said that he did not know if a convenience store (if he found one in the area) would be open that late. In Mississippi every store was closed that late at night. He did not recall a dog barking. After relieving himself, he looked for the bike, but it had been moved. When he found the bike, he attempted to continue his journey home. As he was taking the bike, someone was screaming. The defendant then was attacked, and he, the bike, and the bag with the screwdriver and flashlight hit the ground. He did not know Mr. and Mrs. McCarty or Mr. Ballinger. He told Mr. Ballinger that he was on his way home from Bible study class. He said that he did not know how the purse came to be around his neck. He did not know that the purse was around his neck until he was in the police unit. According to the defendant, the purse did not belong to him. The State asked about the defendant's prior convictions. He admitted to a 1994 conviction for possession of cocaine and a 1997 conviction for burglary of a shed. When confronted with the Boykin transcript in the prior drug case, which indicated that the defendant was convicted of "the charge of transfer of a controlled substance," he admitted that he was incorrect when he said that he had only been convicted of possession of drugs. He denied entering the McCarty residence and picking up the brown purse or the computer bag.
A review of the record reveals no errors patent.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER ONE
The defendant argues that the trial court erred by allowing a State witness to improperly testify to the uncharged misconduct of the defendant in violation of La. C.E. art. 404(B)(1) and La.C.Cr.P. art. 720. He contends that the State did not make the required showing at a pretrial hearing that the evidence of the uncharged misconduct was admissible under one of the exceptions of La. C.E. art. 404(B)(1),[2] as required by State v. Prieur, 277 So.2d 126 (La.1973) and La. C.E. art. 1104. Additionally, the defendant argues that the State did not give him adequate notice of its intention to use the evidence. He claims that the improper admission of the evidence of the uncharged misconduct prejudiced him in a manner that is not harmless beyond a reasonable doubt. The State counters that Mr. Ballinger was not the victim of a burglary, and he never testified that the defendant robbed his house. His testimony was used merely to complete the story of the crime and to explain why Mr. Ballinger was outside with his suspicions raised and why he *1247 watched the defendant so closely when he re-appeared on the red bike.
La. C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The last sentence of La. C.E. art. 404(B)(1) is the codification of the principle of res gestae. If evidence is admissible under the res gestae exception, it is not subject to any notice requirements. State v. Walker, 1999-2217, p. 6 (La.App. 4 Cir. 10/25/00), 775 So.2d 484, 489.[3] The State must give advance notice of evidence of other crimes that the State plans to introduce only when the evidence is to be used as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." If the evidence of other crimes is introduced because it was an integral part of the act that is the subject of the case, no advance notice is required. State v. Williams, XXXX-XXXX (La.App. 4 Cir. 12/10/03), 863 So.2d 652.
In State v. Taylor, XXXX-XXXX, pp. 10-11 (La.1/14/03), 838 So.2d 729, 741-42, cert. den, Taylor v. Louisiana, ___ U.S. ___, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). the Louisiana Supreme Court discussed the admissibility of "other crimes" evidence:
Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as res gestae, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence "to insure that `the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" State v. Colomb, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting State v. Haarala, 398 So.2d 1093, 1098 (La.1981)). The res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. State v. Huizar, 414 So.2d 741, 748 (La.1982); State v. Kimble, 407 So.2d 693, 698 (La.1981). In addition, as *1248 this court recently observed, integral act (res gestae) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, `with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.'" Colomb, 747 So.2d at 1076 (quoting Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
In Taylor, at pp. 8-9, 838 So.2d at 740, the defendant, who was convicted of first degree murder, took issue with the introduction of inflammatory evidence relating to his participation in other crimes committed after the instant offense, and before his arrest at the Mexican border several days later: the Lamoni, Iowa armed bank robbery; the subsequent shooting of the Lamoni police chief during a high speed chase; the theft of a truck in Missouri; and, the defendant's (along with Timothy Taylor's) failure to declare the large amount of cash they were carrying when the inspector stopped them at the border. Although the defendant contended that the evidence of other crimes was erroneously admitted as res gestae because the crimes involved different victims in different states, over a seven-day span, the Louisiana Supreme Court noted that the doctrine of res gestae was designed to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. The Court concluded that even though the defendant admitted his guilt to second degree murder, the defense made specific intent to kill an issue, and the "other crimes" evidence was admissible under the "design or plan" exception if not the res gestae exception. Id. at 743-45. See also State v. Williams, XXXX-XXXX, at p. 8, 863 So.2d at 657.
In State v. Taylor, at pp. 11-12, 838 So.2d at 742, the Court cited and noted the following cases:
In State v. Edwards, 406 So.2d 1331, 1350-1351 (La.1981), testimony that defendant and another accomplice arrived at a third person's house; that defendant suggested they "go make a hit;" that they first went to a grocery store where defendant stole some wine; that they ultimately went to the victim's house, killed her, and sped away from the scene in the victim's automobile; that they followed another woman to a college campus in an attempt to snatch her purse but abandoned the plan when she saw them coming; and that they went to a convenience store looking for still another "hustle" until the appearance of a police officer terminated the night's activities, was admissible as part of the res gestae in defendant's trial for the victim's murder. Again, in State v. Brewington, 601 So.2d 656 (La.1992), this court held the trial court did not err in permitting the prosecution to admit evidence which tended to show the accused possessed crack cocaine and a.357 caliber pistol "three hours after the victim was last seen alive in his presence and less than two hours before her death" because the evidence, "formed an inseparable part of the state's substantial circumstantial evidence linking him to the shooting," and because evidence of cocaine possession was "an integral part of the act or transaction that was the subject of the present proceeding." See also State v. Matthews, 292 So.2d 226, 227 (La.1974) (testimony that defendant, who was charged with armed robbery, stopped four persons and demanded their coats and when one person attempted to flee, defendant shot and killed him, demonstrated the robbery and shooting were part of a single, *1249 continuous transaction, integrated in both space and time, and testimony and photographs relating to the death of one of the victims were admissible).
Id. at pp. 11-12, 838 So.2d at 742.
In State v. Taylor, 838 So.2d at 743,[4] the Court also noted State v. Haarala, 398 So.2d 1093 (La.1981), a case where the defendant was convicted of burglary of a hardware store. There the Louisiana Supreme Court concluded that the references to a possible attempted break-in of the drugstore next door were properly admitted as part of the res gestae. The Court explained that the beating on the drugstore door prompted the complaint to the police and the subsequent investigation. The Court stated: "Reference to that disturbance was necessary to show the immediate context out of which the charged offense arose and to present accurately the state's case." Id. at 1097. The Court noted that the State theorized that the defendant took tools from the hardware store and used them to break into the drugstore across the alleyway. Because the police officers had checked the alleyway fifteen minutes earlier and found nothing suspicious, the burglary of the hardware store and the attempted burglary of the drugstore had to take place within a few minutes of each other. The Court also indicated that the defendant was not unfairly surprised by the reference to the attempted break-in of the drugstore because that charge had been scheduled for trial the same day. Id.
In State v. Walker, at pp. 6-7, 775 So.2d at 489, this Court discussed the res gestae exception, which has been codified in La. C.E. art. 404(B)(1):
This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La. 1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed.1972). The concomitant other crimes do not affect the *1250 accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. 1 Wigmore, Evidence § 218 (3d ed.1940). State v. Haarala, 398 So.2d 1093, 1097 (La.1981).
Id. at pp. 6-7, 775 So.2d at 489, quoting State v. Brewington, 601 So.2d at 657. The res gestae doctrine includes the testimony of witnesses and police officers pertaining to what they heard or observed before, during or after the commission of the crime, provided there is a continuous chain of events under the circumstances. Id.
At the beginning of trial the State indicated that it intended to use the testimony of Gary Ballinger not to introduce facts of other crimes because nothing was taken from Ballinger's house (and the burglary charge was not accepted), but to explain why Ballinger was standing outside to see the burglary of Mr. and Mrs. McCarty's house. The State argued that the testimony would fall under the res gestae exception. The trial court stated: "Well, that's not res juste [sic]. I mean, the facts of the case are the facts of the case." The court asked whether Ballinger was going to testify that the defendant burglarized his house, and the prosecutor answered that nothing was taken from Ballinger's house. According to the prosecutor, Ballinger would testify that he saw the red bike the defendant was riding parked next to his residence. He then walked into his house, saw that things were awry, walked back out, noticed the red bike was gone, and a little later saw the defendant on the red bike. Ballinger was waiting outside for the police when he saw McCarty's residence being burglarized. The defense objected to any mention of any possible burglary. The trial court concluded: "The facts of the case are the facts of the case. The facts as I heard them at the motion hearing, the witnesses would be allowed to testify to those facts. You confuse the issue when you call this res juste [sic]. The prosecutor said that it was just part of telling the story ...". The trial court stated: "Well, listen, I think they have a right to tell the jury about the bicycle. It happened. I'm going to let them tell them about it but let me tell you something, you cross the line, I'm going to declare a mistrial." The defense noted an objection.
Although the trial court somewhat used the language of La. C.E. art. 404(B)(1), part of which seems to codify the res gestae exception, and appeared to indicate that the witnesses had to be allowed to tell the facts of the case, the court stated that it did not consider Mr. Ballinger's testimony to fall under the res gestae exception. The State persuasively argues that Mr. Ballinger did not testify that he had been burglarized; in fact nothing had been taken from his residence. Arguably there was no testimony relating to "other crimes" by the defendant. Even if the testimony is considered "other crimes" evidence, the trial court declared that the facts of the case were the facts of the case, and the jury had a right to hear the story about the bicycle and what Mr. Ballinger saw that night. As in State v. Haarala, 398 So.2d at 1093, reference to the disturbance at Mr. Ballinger's residence was necessary to show the immediate context out of which the burglary of the McCarty house and the defendant's apprehension arose and to present accurately the State's case. It appears that Mr. Ballinger's testimony about seeing his residence in disarray, calling the police, and relocating outside to wait for the officers helps to complete the story of the crime. His testimony is an integral part *1251 of the continuous transaction which resulted in the burglary of the McCarty residence and the Mr. Ballinger's apprehension of the defendant. Under La. C.E. art. 404(B)(1) the testimony was admissible.
If Mr. Ballinger's testimony is considered "other crimes" evidence, the defendant's argument that the State failed to provide notice of its intention to use that "other crimes" evidence as required by La. C.E. art. 404(B)(1) has no merit. If evidence is admissible under the res gestae exception, it is not subject to any notice requirements. State v. Williams, XXXX-XXXX, at p. 6, 863 So.2d at 656; State v. Walker, at p. 6, 775 So.2d at 489.

ASSIGNMENT OF ERROR NUMBER TWO
The defendant argues that the trial court erred by denying the defendant's motion for a mistrial when the prosecutor improperly referred to the uncharged misconduct of the defendant in the opening and closing arguments in violation of La. C.Cr.P. art. 770.
Generally, evidence of other crimes, wrongs, or acts committed by the defendant is inadmissible. See La.C.Cr.P. arts. 770(2) and 770. In State v. Bradford, XXXX-XXXX, pp. 16-17 (La.App. 4 Cir. 4/23/03), 846 So.2d 880, 891, quoting State v. Edwards, 97-1797, p. 20 (La.7/2/99), 750 So.2d 893, 906, the Louisiana Supreme Court summarized the jurisprudence:
Potentially damaging remarks include reference to race or religion, when not material or relevant to the case, and direct or indirect reference to another crime committed or alleged to be committed by the defendant, unless that evidence is otherwise admissible. La.Code Crim. P. art. 770. The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La.1982). Moreover, a comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976) (where reference to a "mug shot" was not unmistakable reference to a crime committed by defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971) (where no crime was evidenced by a police officer's reference to obtaining defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. See State v. May, 362 So.2d 516 (La.1978).
In State v. Juarbe, 2001-2250 (La.App. 4 Cir. 7/31/02), 824 So.2d 1240, this Court discussed the drastic remedy of mistrial:
Mistrial is a drastic remedy and is warranted under La.Code Crim. Proc. art. 770 only when a remark or comment referencing an accused's commission of other crimes results in prejudice to his substantial rights sufficient to undermine the fairness of trial. Assessing prejudice and deciding whether to grant or deny a mistrial lies in the sound discretion of the trial court. State v. Connolly, 96-1680, p. 23 (La.7/1/97), 700 So.2d 810, 824. Even though Article 770(2) is couched in mandatory terms (a "mistrial shall be ordered ...."), the admission of other crimes evidence is subject to harmless error analysis. State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. *1252 Id. at p. 7, 824 So.2d at 1247, quoting State v. Broaden, 99-2124 (La.2/22/01), 780 So.2d 349, 367.
During opening argument the State said: "They found a screwdriver and they found a knife. All burglary tools that were used by Mr. Brown to break into the residences in this area." The defense objected. At a sidebar defense counsel argued that the State had made an improper argument referring to crimes with which the defendant had not been charged. Counsel claimed that the argument that Mr. Ballinger saw the red bike, found his house in disarray (looks like someone burglarized it), then noticed that the red bike was gone, and then saw the defendant on the red bike "implies the witness's house has been burglarized and what you're telling the jury." The trial court cut in to state that it had already ruled on that issue. Defense counsel asked if he could finish, and the court answered negatively and said that it had already ruled and did not intend to reverse itself. Counsel then argued:
Your Honor, then she says he has the flashlight, knife, screwdriver, all of the things that go along with burglarizing residences in this area. My client is charged with one burglary here. That, culminating with the other implicating a second burglary for which Mr. Brown is not charged and then suggesting the break in of several residences, that is grounds for a mistrial and I would like to move for a mistrial
The trial court denied the motion and noted a defense objection.
During closing argument the prosecutor stated: "Mr. Brown was caught right outside that house. Mr. Brown was caught red-handed that night. Ladies and gentlemen, he was caught in the middle of his little crime spree." Defense counsel objected; the objection was overruled with a caution. Jury instructions were then given and the jury was escorted to the jury lounge. The trial court asked if either side objected to the jury charge. Both answered negatively. Then the court asked if anyone wanted to put on the record any arguments about chains of custody or moving for mistrials. Defense counsel then stated: "I want to be sure that the record does reflect that we are moving for a mistrial based on the side remark by the State." The court declared: "After the crime spree remark by Mr. Orechwa?" Counsel answered affirmatively, and the court declared: "All right, so noted."[5]
The prosecutor's comment in the opening argument consisted of using "residences" instead of "a residence" when he was referring to how the defendant used the burglary tools that he had in his possession when he was arrested. One such plural reference (instead of using the singular form) would not appear to warrant the drastic remedy of a mistrial. The prosecutor's remark did not "unmistakably" point to evidence of another crime by the defendant. The trial court did not err by denying the motion for mistrial after the prosecutor's comment in the opening argument.
The prosecutor's second comment in closing argument that the defendant was caught "in the middle of his little crime spree" again is not clearly a reference to other crimes that the defendant has committed. The remark did not "unmistakably" point to evidence of another crime. The prosecutor's comment in the closing argument would not appear to warrant *1253 the drastic remedy of a mistrial. Defense counsel had not even moved for a mistrial at the time that the objection was lodged; the request for a mistrial was noted after the jury instructions had been read and the jury retired. Even if considered a reference to "other crimes" that should have required a mistrial, it would appear that the trial court's error would be harmless in light of the totality of all the evidence. Viewing the evidence and testimony presented against the defendant, the prosecutor's comments did not likely contribute to the verdict. The testimony and circumstances of the case overwhelmingly established the defendant's involvement in the burglary of the McCarty home.
For these reasons, we affirm defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The defendant also filed the motion to dismiss in this court as writ 2002-K-2216. The defendant withdrew his motion to dismiss here as well; on December 3, 2002 the writ was denied.
[2] It does not appear that there was a pretrial Prieur hearing; the minute entries do not show such a hearing and no transcript of the hearing was included in the appellate record.
[3] On writs, the Louisiana Supreme Court vacated the sentence, but otherwise affirmed the opinion. State v. Walker, XXXX-XXXX (La.10/12/01), 799 So.2d 461.
[4] In State v. Taylor, 838 So.2d at 758, fn. 8, in a footnote the Court noted a number of cases in addition to State v. Haarala, 398 So.2d at 1093, involving the res gestae exception:

See also State v. Bilbo, 97-2189, pp. 9-10 (La.App. 1 Cir. 9/25/98), 719 So.2d 1134, 1139 (evidence defendant, charged with kidnapping, had stolen car from car dealership in Florida six days earlier by threatening car salesman while on test drive, had driven stolen car to California, and was involved in accident in Louisiana just before kidnapping victim who stopped to see if she could assist defendant and his companions with car trouble, was relevant to, and admissible in, kidnapping prosecution, under exception to general rule of inadmissibility of other crimes evidence for conduct that constitutes integral part of act or transaction that is subject of prosecution); State v. Camp, 580 So.2d 957, 960 (La.App. 5th Cir.1991)(witness's reference to knife taken from defendant after his apprehension was admissible as integral part of burglary; even though carrying concealed weapon was not element of that offense, defendant was chased from scene of burglary until he was apprehended, and police arrived soon thereafter and discovered knife); State v. Tarleton, 545 So.2d 1195, 1198 (La.App. 4th Cir.1989)(testimony of second armed robbery victim was admissible against defendant accused of armed robbery under res gestae exception to rule barring admission of evidence of other crimes; defendant's armed robbery of second victim was factor leading to his identification and arrest and extremely relevant to show his connexity with stolen property of complaining victim).
[5] The trial court did not expressly deny the defense motion for a mistrial; however, clearly the court did not grant the motion for a mistrial.