EDWIN A. LOMBARD, Judge.
I,The defendant, Lloyd A. Barnes, appeals his convictions for murder and attempted murder. After review of the *929 record in light of the applicable law and arguments of the parties, we affirm.

Relevant Procedural History

On January 28, 2010, the defendant was indicted for the October 18, 2009, second-degree murder of Korey “Project” Griffin in violation of La.Rev.Stat. 14:30.1 and the attempted second-degree murders of the Griffin’s friends, Clayton Burds and Robert Dilbert. The defendant pleaded not guilty to all charges on February 2, 2010. His motions to suppress the evidence and identification were denied. The State filed a Prieur notice to introduce evidence of a 1999 shooting.
On December 1, 2010, the jury found the defendant guilty of the second-degree murder of Griffin and the attempted second-degree murder of Burds, but found him not guilty of the attempted second-degree murder of Dilbert. The court sentenced the defendant to life imprisonment for second-degree murder and to thirty years for attempted second-degree murder.

Relevant Facts

The following evidence was adduced at trial.
1 gOfficer Micheleen Scott of the New Orleans Police Department (NOPD) testified that on October 18, 2009, she investigated an auto collision at Washington Avenue and LaSalle Street. The occupants of one of the vehicles, Griffin and Burds, had both sustained gunshot wounds but were able to communicate with her at the scene. Burds gave Officer Scott a narrative of the shooting and the vehicle accident, describing the shooter as a male approximately six feet tall wearing grey sweatpants. Officer Scott wrote the initial report of the collision, noting that no weapons were found in or near the vehicle.
Officer Shandrell Privott of the NOPD crime lab processed the collision scene and photographed a maroon car and Griffin’s silver Chevy Malibu. The officer recalled that the back passenger window of the Malibu was shattered and that the car’s airbags had deployed. While the front seat of the Malibu contained blood spots, the only other evidence — a spent bullet— was found in the back seat.
Detective Tim Sisón of the NOPD assumed the investigation of the auto collision from Officer Micheleen Scott. Detective Sisón learned that the collision was related to a shooting in the 2000 block of Second Street and, at the time of the collision, the Malibu was traveling north on Washington Avenue, against traffic, when it collided with a parked car. The occupants of the Malibu had been removed and placed in separate EMS units for transport to University Hospital. Sison’s cursory inspection of the vehicle indicated that no weapons were found in or near the vehicle. Detective Sisón relocated to University Hospital and obtained a description of the shooter from Burds but was able to speak with the Griffin very briefly. In addition to explaining the events leading to the shooting, Griffin and Burds gave a description of their assailant. Detective Sisón collected, labeled and placed the blood stained clothing worn by Griffin and Burds into Central Evidence. |3Upon returning to the hospital the next day, Detective Sisón learned that Burds had been released but that Griffin had died during surgery. Upon the Griffin’s death, Detective Sisón transferred the investigation to the NOPD homicide division.
Under cross examination, Detective Si-son related that Burds described the shooter as being about six feet tall and wearing gray sweat pants.
Homicide Detective Robert Long of the NOPD assumed the investigation from Detective Sisón, who provided him the names and contact information for the decedent’s *930 family. The day after the shooting, Long met with the decedent’s mother, Ms. Patricia Griffin, who gave him a gist of the shooting incident. She also provided contact phone numbers for Burds and Dilbert. Detective Long also retrieved a deformed projectile from the hospital. According to Detective Long, Burds and Dilbert had described the shooter in statements to Detective Sisón as a bald, older male with missing teeth and a stocky build who was wearing a white tee shirt and gray sweat pants. Pursuant to his conversation with Burds and Dilbert, Detective Long relocated to the house where the shooting had purportedly occurred and spoke to “Carolyn,” who was said to be associated with the defendant.
Subsequently, on October 20, 2009, Detective Long executed a search warrant at 2028 Second Street, the residence of Ms. Carolyn Lofton and the defendant. He transported Ms. Lofton and the defendant to the homicide office to interview them. Based upon Ms. Lofton’s revelation that she was an eyewitness to the shooting, Detective Long obtained a warrant for the defendant’s arrest. Detective Long identified the photo lineups from which Burds and Dilbert identified the defendant as the man who shot and killed the victim.
|4Officer Kathy Robertson, the 911 communications supervisor of the New Orleans Police Department (NOPD), testified that all 911 calls are recorded, documented by date, time and location of the incident, and assigned an incident item number that is referenced to the investigation of the incident reported. Officer Robertson listened to a portion of a tape recording and identified it as the 911 call reporting the shooting in this case.
Pathologist Dr. Richard Tracy performed the autopsy on the decedent’s body. Dr. Tracy explained that the decedent sustained three gunshots to the back of his body. The bullet that caused his death entered his back, traveled to his abdomen and passed through major blood vessels, causing him to bleed to death. Dr. Tracy opined that even though the wound was fatal, the decedent could have remained conscious for about a minute before passing out. According to Dr. Tracy, two of the gunshot wounds were consistent with the victim being shot while he was on the ground.
Dilbert related that on the day that Griffin was killed, Griffin and Burds met him at his house at about 7:00 a.m. Griffin was driving a Chevy Malibu, and Burds and Dilbert rode as passengers in the front and rear seats, respectively. The three drove around the central city area smoking marijuana and then decided to stop at a residence in the 2000 block of Second Street. Burds and Dilbert remained in the car while Griffin went inside for about five minutes. According to Dilbert, Griffin was irate when he returned to the car, demanding an apology from someone in the residence. Dilbert and Burds decided to return to the residence with Griffin. They approached the house by walking in the street. None of them entered the front yard of the residence, nor did they go onto the steps or the porch of the residence. Dilbert stated that they were unarmed and had no weapons in the | ¡¡Malibu. A few moments after they arrived at the residence, the defendant and Carolyn Lofton exited the front door arguing. When Ms. Lofton saw Griffin, she explained to the defendant that he was a “regular.” Still irate, Griffin demanded an apology from the defendant, who refused to apologize and began shooting at them. Dilbert turned and ran down Danneel Street to Washington Avenue.
Dilbert related the specifics of the shooting to Detective Long and identified the *931 defendant from a photo lineup as the shooter.
Under cross-examination, Dilbert denied that he, Griffin and Burds got together that day to buy or sell drugs. He also said that the first shot the defendant fired hit Burds.
Burds testified that he and Griffin arrived in the city around 6:00 p.m. on the day before the shooting and sold drugs all night at Ms. Lofton’s Second Street residence. The next morning, Burds, Griffin, and Dilbert met in the mid-city area. Burds stated that they were not armed that day. They rode around the uptown area, purchased marijuana and then returned to Ms. Lofton’s residence on Second Street. Griffin entered the residence while he and Dilbert remained in the car. A few moments later, Griffin returned to the car and said: “Nigger up in there tripping.” Just then, the defendant and Carolyn Lofton exited the house and stood on the porch. Ms. Lofton asked Griffin what was going on and he responded that he wanted an apology from the defendant. The defendant refused to apologize and said: “I ain’t apologizing for shit. That shit dead.” Neither Burds, Dilbert nor Griffin entered the yard or went to the door of the residence. Immediately after Ms. Lofton explained to the defendant that she knew Griffin, the defendant shot Burds in the leg. Burds and Griffin ran toward Saratoga Street while Dilbert ran in the opposite direction. The defendant chased Burds and Griffin on foot. Burds | fimade it into the parked Malibu but the defendant fired at the Malibu shattering the back window and hitting Burds in the back. Then the defendant chased and shot Griffin. As Griffin lay on the ground, the defendant stood over him and continued to shoot. Burds tried to run over the defendant with the Malibu, but the defendant ran into the Second Street residence. Griffin got into the Malibu’s driver’s seat and drove while Burds called 911. Burds passed out as he contacted the 911 operator but awoke when he heard the operator’s voice. Griffin was able to drive the Malibu for a few blocks before he passed out and collided with a parked vehicle. Burds spoke to detectives at the hospital and he identified the defendant from a photo lineup as the shooter. Burds stated that Griffin was not a violent person and never carried a gun.
In 1999, Sergeant Jimmie Turner investigated a shooting in the 3200 block of General Ogden Street. Sergeant Turner spoke to the victim, Cornelius Wells, who identified the defendant as his assailant. Wells identified the defendant from a photo lineup. Cornelius Wells testified that the defendant shot him in the arm, back, leg and stomach on May 13, 1999, on General Ogden Street. He explained that a man gave him money to buy drugs for him, but Wells failed to return with the drugs. The man later tracked him down, and the defendant shot him.
The State and defense stipulated that if Officer Kenneth Leary were called to testify, he would be qualified as an expert in the area of ballistics and firearms examination and identification. He would testify that the bullet recovered from the vehicle collision scene and the bullet recovered during the victim’s autopsy were consistent with .45 caliber class ammunition and were fired from the same weapon.
Detective Long was called by the defense and stated that neither the victim, Burds or Dilbert told him they were drug dealers.
17Ms. Carolyn Lofton testified for the defense that, through his friendship with her son, she had known “Project” for years. On the morning of the shooting, she was sleeping in her residence on Sec *932 ond Street[1] when Griffin arrived. She awoke to an argument between the defendant and Griffin over Griffin entering her house while she slept. Ms. Lofton quelled the confrontation and told Griffin to leave. As Griffin was leaving, he warned the defendant that he better not go outside that day. Ms. Lofton locked the door behind Griffin but then had to open it to allow the defendant to leave. When she reopened the door, Griffin and two of his friends were approaching her residence. Griffin pointed the defendant out to his friends and said: “That’s him ... [h]e’s going to apologize to me.” Ms. Lofton stood on the porch and the defendant stood behind her. She feared that Griffin and his friends had come to “jump” the defendant. Although she warned them not to come into her yard, one of Griffin’s friends jumped on the porch and swung at the defendant. As the other friend entered the gate, Ms. Lofton heard a gunshot but did not know where it came from. Burds fell off the porch and they all ran away. According to Ms. Lofton, she went back to sleep. Under cross-examination, Ms. Lofton admitted that she told the police that the gunshot came from behind her.
The defendant testified that his name was Lloyd Bornes, though his name is sometimes incorrectly spelled “Barnes.” He admitted to having criminal convictions — 1985 simple robbery; 2006 and 2007 assaults; 2008 evading arrest and criminal trespassing. At the time of the shooting, the defendant was living with Ms. Lofton at 2023 Second Street. He testified that there was no buying or selling of drugs at the residence. The defendant’s usual daily routine was to have |scoffee with his friend, Mr. Duey, in the morning and then go to his mother’s house. Typically, at the end of the day, he returned to the Second Street residence.
The defendant recalled that about 7:30 a.m. on the day of the shooting, he was preparing to have his morning coffee with Mr. Duey when Griffin knocked at the door asking for “moms”, the name given Ms. Lofton by her children and their friends. The defendant advised Griffin that Ms. Lofton was asleep and suggested that he come back later but Griffin demanded that he wake her up. The defendant refused and a verbal confrontation erupted. The defendant walked to the back of the house and called to Ms. Lofton. As the defendant turned around, he discovered that Griffin had followed him to Ms. Lofton’s bedroom. The defendant admonished Griffin for his disrespectful behavior, to which Griffin responded: “F— you.” Just then, Ms. Lofton appeared asking what the loud talking was about. The defendant explained the situation to her. Ms. Lofton told Griffin to leave and, as he did so, he said to the defendant: “Just for that, you can’t come outside today.” Griffin told Ms. Lofton: “That nigger gonna apologize. He don’t know me.” Ms. Lofton closed the door. Moments later, she noticed Griffin and two of his friends coming to the house. Griffin climbed the front steps and Burds jumped onto the porch. Dilbert remained at the front gate. Griffin stood directly in front of Ms. Lofton and swung at the defendant. The defendant shot Burds out of fear for his and Ms. Lofton’s safety. Then the defendant shot Griffin as he ran away and continued to shoot until his gun was empty. Griffin and Burds drove away in a Malibu. The defendant placed his gun in the utility shed in the back of the house. The defendant claimed that he did not know that he had shot anyone.
*933 The defendant said that Griffin was not armed when they confronted one another on the porch. He did not know whether Burds was armed, but he did not |9see a weapon. The defendant said that he did not know what Griffin and his friends were going to do when they returned, but he felt that they were going to “kick his ass.” After the shooting, the defendant went to his mother’s house to watch the Saints’ game.
Under cross-examination, the defendant affirmed that he shot the victim and Burds in the back. Further, he fired all the bullets in his gun as the three men were running. He did not see a weapon in either the victim’s or Burds’ hands as they approached the porch. During a phone call while he was incarcerated, the defendant told his mother to remind Ms. Lofton that everything happened on the porch. The State played the recording of the call in which the defendant told his mother to tell Ms. Lofton that Mr. Duey was going to tell the police everything happened on the porch.

Error Patent Review

A review for errors patent on the face of the record reveals one. The sentence for second-degree murder is statutorily mandated to be served without benefits of probation, parole and suspension of sentence. La.Rev.Stat. 14:30.1 B. The judge in this case failed to restrict the defendant’s life sentence as to benefits. Nevertheless, this error will be corrected automatically by operation of La. R.S. 15:301.1; State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790. Accordingly, we need not take any action.

Assignment of Error 1

In his first assignment of error, the defendant complains that the State failed to prove his guilt beyond a reasonable doubt. Specifically, he argues that the State failed to prove that he did not act in self-defense when he shot and killed the victim and shot Burds.
ImThe standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
The defendant herein was found guilty of second-degree murder and attempted second-degree murder. Second-degree murder is defined as the killing of a human being with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1; State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517.
La. R.S. 14:27, which defines “attempt,” reads in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circum *934 stances, he would have actually accomplished his purpose.
Thus, to convict the defendant of attempted second-degree murder, the State had to prove beyond a reasonable doubt that he specifically intended to kill Burds and that he committed an “act for the purpose of and tending directly toward the accomplishing of’ that intent. La.Rev. Stat. 14:27(A); 14:S0.1(A)(1). “Specific criminal intent is that state of mind which exists when the circumstances indicate |nthat the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La.Rev.Stat. 14:10(1). It may be “inferred from the defendant’s actions and the circumstances of the transaction.” State v. Brown, 2003-897, p. 22 (La.4/12/05), 907 So.2d 1, 18.
When a defendant claims that he acted in self-defense, the State must prove beyond a reasonable doubt that the homicide was not justifiable under La.Rev.Stat. 14:20. State v. Causey, 96-2723 (La.App. 4 Cir. 10/21/98), 721 So.2d 78. A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or of receiving great bodily harm and that the homicide is necessary to save himself from that danger. La.Rev. Stat. 14:20(A)(1). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict. Id.
In a non-homicide case where self-defense is raised, the reviewing court must conduct a dual inquiry: it must objectively determine whether the force used was reasonable under the circumstances; and it must also subjectively decide whether the force was apparently necessary. State v. Freeman, 427 So.2d 1161 (La.1983).
After reviewing the evidence in the light most favorable to the prosecution, the State proved that the defendant did not act in self-defense. Dr. Tracy testified |12that the victim sustained three gunshots to the back of his body. The bullet that caused the victim’s death entered his back, traveled to his abdomen and passed through major blood vessels, causing the victim to bleed to death. Dr. Tracy further testified that two of the gunshots wounds were consistent with the victim being shot while he was lying on the ground. In addition, Burds testified that the defendant shot him in the back and then chased the unarmed victim continuing to shoot at the victim until the gun ran out of ammunition. Moreover, the defendant’s own testimony negated his claim of self-defense. Under questioning during cross-examination, the prosecutor asked:
Q. And at that point, what’s the next thing that happens? Clayton—
A. Clayton’s on the porch. He comes toward me with a swing. I shoots [sic]. The [victim] turns around and runs down the steps. I shoots [sic], and I kept shooting ...
Q. ... you shoot Clayton on the porch. Then you shoot, as you described, the big man (the victim), as he’s running from the porch?
A. Running down the porch, yes.
Q. So as he’s running away from you, you shot him?
A. Yes.
Q. As he’s running away from you?
*935 A. Running down the steps.
Thus, according to his own testimony, the defendant was not trying to avoid the victim when he shot him; instead, the defendant armed himself to confront Griffin, Burds and Dilbert, all of whom were unarmed. As the defendant claimed, Griffin was younger and larger than him, but the defendant could have avoided the shooting by merely stepping back into his residence and closing the door. The only evidence of provocation came from the defendant’s testimony. The jury’s | ^rejection of the defendant’s provocation testimony is an issue of credibility and not an abuse of discretion. See State v. Byes, 97-1876 (La.App. 4 Cir. 4/21/99), 735 So.2d 758. As such, the evidence does not show that the defendánt was justified in using deadly force to avoid harm to himself or Ms. Lofton. Accordingly, the State presented sufficient evidence to counter the defendant’s self-defense claim beyond a reasonable doubt and the jury did not err by convicting him of second-degree murder and attempted second-degree murder. This assignment is without merit.

Assignment of Error 2

In this assignment, the defendant argues that the provisions of La. Const. Art. 1, § 17(A) and La.C.Cr.P. art. 782 A allowing non-unanimous jury verdicts in felony cases violate the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment to the United States Constitution that non-unanimous jury verdicts are unconstitutional.
This argument has been rejected time and again by the Louisiana Supreme Court. See State v. Bertrand, 2008-2215, p. 6 (La.3/17/09), 6 So.3d 738, 742 and progeny. Nevertheless, defendant urges reconsideration of this issue in light of recent pronouncements of the United States Supreme Court, in McDonald v. City of Chicago, — U.S.-, 130 S.Ct. 3020, 3035, 177 L.Ed.2d 894 (2010), that he claims call into question the holding of Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), that non-unanimous verdicts in state felony prosecutions are permissible under the Sixth Amendment. In support of this contention, he quotes language from McDonald to the effect that the “incorporated Bill of Rights’ protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal | urights against federal encroachment” and “[t]he relationship between the Bill of Rights’ guarantees and the States must be governed by a single, neutral principle.” McDonald, 130 S.Ct. at 3035, 3048. Thus, defendant argues the issue of jury unanimity is ripe for reconsideration.
Defendant’s argument is without merit. In McDonald, the U.S. Supreme Court recognized that most, but not all, of the protections of the Bill of Rights have been extended to the states through the Fourteenth Amendment. McDonald, 130 S.Ct. at 3034-35. However, citing Apodaca in support of the proposition, the Supreme Court specifically stated in McDonald that, although the Sixth Amendment requires unanimous jury verdicts in federal criminal trials, it does not require unanimous jury verdicts in state criminal trials. McDonald, 130 S.Ct. at 3035 n. 14. In McDonald the Supreme Court reaffirmed the holding of Apodaca, rather than questioned it.
This assignment is meritless.

Assignment of Error 3

In his final assignment, the defendant argues the trial court erred when it permitted the introduction of inadmissible other crimes evidence relative to a 1999 shooting incident involving the defendant. *936 The defendant contends that this evidence was highly prejudicial and of no probative value.
La.Code Evid. art. 404B(1), the controlling statutory authority on this issue provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of |1Btrial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, a court may not admit evidence of other crimes to show a defendant is a man of bad character who has acted in conformity with his bad character. State v. Brown, 2003-1616, p. 6 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, quoting State v. Taylor, 2001-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741.
However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La.Code Evid. art. 404 B(l). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. State v. Prieur, 277 So.2d 126 (La.1973). Additionally, the State must prove that the defendant committed the other acts. Id.
In State v. Arrington, 97-2059, pp. 7-8 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, 1091, this court discussed the use of evidence of other crimes:
Before evidence of other crimes is admitted as proof of intent, three prerequisites must be satisfied: (1) the acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Romero, 574 So.2d 330, 336 (La.1990); State v. Kahey, 436 So.2d 475, 488 (La.1983). In addition, there must first be clear and convincing evidence of the commission of the other crimes and the defendant’s connection with them ...
A trial court’s ruling on the admissibility of evidence pursuant to La. Code Evid. art. 404 B(l) will not be disturbed absent an abuse of discretion. State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
La. C.E. art. 1104 sets forth the burden of proof in such instances:
State v. Prieur, pretrial; burden of proof
11fiThe burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
In Huddleston v. U.S., 485 U.S. 681, 682, 108 S.Ct. 1496, 1497, 99 L.Ed.2d 771 (1988), the U.S. Supreme Court, in reviewing the standard of proof for other crimes evidence under Federal Rule of Evidence 404(B), concluded that the trial court does not have to make a preliminary finding that the prosecution has proved the “other act” by a preponderance of the evidence before the trial court allows the evidence to be submitted to the jury. The Court *937 held other crimes evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.[2]
In this case, under either the preponderance of evidence or clear and convincing standard,[3] the State proved that the defendant committed the shooting in 1999 through the testimony of Sergeant Turner and Cornelius Wells. 117Specifically, Sergeant Turner testified that he investigated the shooting of Cornelius Wells in May 1999. Turner learned from Wells the identity of the shooter and how to locate him. On May 27, 1999, Turner compiled a photographic lineup from which Wells identified the defendant as the man who shot him in the back. Wells testified that the defendant shot him in his leg, arm, back and stomach on May 13, 1999, as Wells was running away from the defendant. Wells related that the shooting stemmed from a drug deal — a man had given Wells money to buy drugs for him. After Wells failed to deliver the drugs and did not return the money, the defendant tracked Wells down and shot him. Wells identified the defendant from a police photo lineup and in court as the man who shot him.
The State offered the evidence to show that the defendant was motivated to shoot people involved in the drug trade who disrespect him. Based on the foregoing, the trial judge did not abuse her discretion in admitting the evidence of other *938 crimes. The State met its burden of proof in that regard. However, even assuming the trial court did err in admitting the other crimes evidence, the error is harmless. The erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Maise, 2000-1158 (La.1/15/02), 805 So.2d 1141. The test for determining harmless error is whether the reviewing court may conclude that the error was harmless beyond a reasonable doubt, State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, or “whether the guilty verdict actually rendered in [the] trial was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous |18crimes evidence must outweigh its prejudicial effect. La.Code Evid. art. 403; State v. Hatcher, 372 So.2d 1024, 1033 (La.1979).
The defendant herein pleaded self-defense; the State introduced the other crimes evidence as proof of his motivation to shoot drug dealers who crossed him. The defendant testified that he shot Griffin and Burds in the back as they attempted to escape. Further, he admitted that he shot at them until his ammunition ran out. The defendant’s testimony disproved his claim of self-defense. The other crimes evidence was more probative than prejudicial. Thus, it can be concluded beyond a reasonable doubt that the jury rested its verdict on the evidence properly introduced rather than the 1999 shooting.
This assignment has no merit.

Conclusion

The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. In closing argument, the prosecutor referenced Ms. Lofton’s residence as "a crack house ... a straight up crack house.” (Tr. trans. p. 764).

. See Justice Traylor's concurring opinion in State v. Connolly, 96-1680, p. 1, 2 (La.4/28/98), 707 So.2d 1249:
I write only to correct what I believe to be a misstatement of the standard of proof required for admissibility of unadjudicated other crimes ... As I read and apply [La. C.E.] article 1104, the burden of proof required of the state in order to introduce evidence of other crimes has been reduced from "clear and convincing” to "sufficient evidence to support a finding by the jury that the defendant committed the act” ... The U.S. Supreme Court has addressed the burden of proof required for admissibility under Rule 404 and held that "such evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.” Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). This Court interpreted Huddleston in Brooks I and stated that the federal standard was “a mere preponderance of the evidence.” State v. Brooks, 541 So.2d 801, 813 (La.1989) (citing to Huddleston). However, such a standard was specifically rejected in Huddleston. Huddleston, 485 U.S. at 687, 108 S.Ct. at 1500. The Huddleston court concluded that proving the act by a preponderance of the evidence is not necessary, Id. at 689, 108 S.Ct. at 1501, and went on to explain that the trial court does not weigh credibility and does not make a determination that the government has proven the act by a preponderance of the evidence. Id. at 690, 108 S.Ct. at 1501-02. Instead, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence.” Id.
Therefore, the burden of proof for admission of other crimes under Prieur and La. Code Evid. art. 404 as modified by [La. C.E.] art. 1104 is sufficient evidence to support a finding by the jury that the defendant committed the act.

. In State v. Arrington, 97-2059, pp. 7-8 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, 1091, this court declared that there must be clear and convincing evidence of the defendant’s commission of the prior offense. However, the Louisiana Supreme Court has not made a determination concerning the burden of proof — clear and convincing versus preponderance of the evidence. In State v. Jacobs, 99-0991, pp. 24-25 (La.5/15/01), 803 So.2d 933, 952, n. 15, the Louisiana Supreme Court stated: "The standard for determining a defendant’s connexity with the other prior crimes, i.e., by a preponderance of the evidence or by clear and convincing evidence, for purposes of determining admissibility of other crimes evidence, remains an open question in this court. See La.Code Evid. art. 1104.”