JAMES F. McKAY, III, Chief Judge.
| j Michael Allen (“defendant”) was convicted of the second degree murder of Arthur Brown (“Mr. Brown”). Finding no patent errors or merit to any of the defendant’s assignments of error, we affirm the defendant’s conviction and sentence.
STATEMENT OF THE CASE
The defendant was charged by grand jury indictment on October 1, 2009, along with codefendant Michael Treaudo (“Mr. Treaudo”),[1] with second degree murder of *726 Mr. Brown a/k/a “Rat or Rat Rat”, a violation of La. R.S. 14:30.1.[2] The defendant pleaded not guilty at his October 13, 2009 arraignment. The trial court denied the defendant’s motions to suppress the evidence and the identification on January 26, 2010. The trial court granted the State’s Prieur[3] motion on August 18, 2011.
1¡¡The defendant was tried by a twelve-person jury on September 26-28, 2011, and found guilty as charged. On October 14, 2011, the trial court denied the defendant’s motion for post-verdict judgment of acquittal and sentenced him to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
FACTS
Nicole Jackson testified at trial that Mr. Brown was the father of her child. They were living together on June 7, 2009. On that morning, the couple’s son came inside around 11:00 a.m. to tell her that “Little Mike”[4] wanted to see “Rat,” who was taking a shower. Ms. Jackson testified that she did not like “Little Mike,” Approximately five minutes later their son came back inside and said a girl outside wanted to see “Rat.” Ms. Jackson went outside to see an SUV parked on the opposite side of the street. She told the girl that “Rat” was in the shower, and the girl said something about a cell phone. As Ms. Jackson turned to go back inside, she said Mr. Treaudo leaned up in the driver’s seat and asked her where “Rat” was. She turned around and told him that “Rat” was in the shower. She returned inside and told “Rat” that Mr. Treaudo was outside. “Rat” went outside and came back in. He was coming in the room to say something, but he stopped in the middle of the room, threw his hands up, said “F — k it,” and turned around and walked back out. She never saw him alive again.
At some point, Ms. Jackson’s son ran inside saying that someone had said that “Rat” had been shot. “Rat’s” sister called about that time, telling her that Usomeone had called her saying that “Rat” had been shot. Ms. Jackson called “Rat’s” cell phone, and a male answered. He told her an individual was dead, and she ascertained by a description of the individual’s tattoos and clothing that it was “Rat.” A detective subsequently met with her and showed her a photo lineup in which she identified Mr. Treaudo. Ms. Jackson said Mr. Treaudo and Mr. Brown grew up together. She claimed that she did not know the defendant.
Ms. Jackson confirmed on cross examination that she had seen Mr. Treaudo in a blue SUV, in the driver’s seat, and that he had asked for “Rat” to come outside. She testified that she did not see the defendant that day.
Yolanda Merritt (“Ms. Merritt”) testified that she lived on New Hampshire Street in eastern New Orleans, in the Maple Ridge *727 subdivision, and that she had resided in that subdivision since the late 1980’s. She was home on June 7, 2009, a Sunday, with her mother, when she heard what sounded like gunshots. She looked out a window and saw a teal-colored Chevy SUV, with tinted windows, occupied by two black males. The vehicle was proceeding at a normal speed coming from the direction of Red Maple Drive and onto New Hampshire Street. She wrote down on a small “sticky note” the last three digits of the license plate “7-0-9,” the make (“Chevy”) and color (“teal”) of the SUV, and the time, 12:83 p.m. The NOPD incident recall reflected that the 911 call was initiated at 12:85 p.m. She identified a pack of small, rectangular sticky notes introduced in evidence, with the top note being the one on which she had written that information.
Ms. Merritt described the driver as a “small built” young black male, with dreadlocks, wearing a white T-shirt, and the passenger as a bigger, stockier, male. The driver was on a cell phone and had his head turned toward the passenger, while the passenger was looking straight ahead. A minute or two later she heard | ¿screaming. She recalled a neighbor coming toward her home screaming that someone had been shot. She called 911 and reported the vehicle and occupants she had seen. The police talked to her that day; a couple of days later she was shown two photo lineups, State Exhibits 13 and .14. In S-13 she identified photo number one as depicting the driver of the teal Chevy SUV. The SUV had driven past her home with the driver’s side facing her home. She could not identify anyone in the S-14 photo lineup. Ms. Merritt replied in the affirmative when asked on cross examination whether she had gotten a look at the passenger in the teal Chevy SUV, but was unable to identify anyone.
New Orleans Police Department (“NOPD”) 911 operator Yolanda Haynes (“Ms. Haynes”) identified a 2009-911 incident recall and audiotape under NOPD item number F-8717-09. She verified that the caller identified herself as Ms. Merritt. Ms. Haynes confirmed that the incident recall reported that the vehicle involved was a blue Chevy SUV with a partial license plate number of “7-0-9,” occupied by one dark-complected black male with dreadlocks. She also testified that the incident recall contained a dispatch at 12:36 p.m. of a truck occupied by several males; a notification of a unit responding to a dispatch, giving a location of 13031 New Hampshire Street; a dispatch from a citizen calling from 5210 Red Maple Drive; and a dispatch with a description of the victim and describing the perpetrators as two black males driving a Chevy, with a partial license plate number “7-0-9.”
NOPD Homicide Detective Richard Chambers testified that he responded to a homicide call on June 7, 2009, to Red Maple Drive. Detective Chambers identified a number of crime scene photographs. No spent cartridge casings were found at the scene. He opined that the lack of cartridge casings indicated that |5either a firearm that did not eject spent cartridge casings — like a .revolver-type firearm — was used in the shooting, or that the shooting did not occur in that area. Collected as evidence at the scene were a Samsung green T-Mobile flip cell phone; a white Walgreen’s bottle cap; one “sporting waves” container lid; and one spent projectile recovered when Mr. Brown’s body was removed.
Detective Chambers confirmed that he was not the lead detective in the ease. He did not talk to any witnesses. His duties were to view the scene and direct the crime lab to retrieve evidence.
*728 NOPD Homicide Detective Kevin Burns was the lead detective in the homicide investigation. At the scene, Detective Burns inspected Mr. Brown’s cell phone and found various names listed therein.
One name in Mr. Brown’s cell phone was, Lamyra Henry (“Ms. Henry”), who also had a child with Mr. Brown. The cell phone call log reflected that Mr. Brown called Ms. Henry at 12:05 p.m., which was a missed call, and then called her again at 12:07 p.m., when Mr. Brown talked to Ms. Henry for ten minutes and three seconds. After speaking with Ms. Henry, Detective Burns ascertained that the victim was alive at 12:17 p.m., and that he had been killed at approximately 12:33 p.m.
Another name in the cell phone was that of Ms. Jackson. Pursuant to the conversation with Ms. Jackson, Detective Burns was able to confirm Mr. Brown’s identity. He also learned that Mr. Brown left his residence with Mr. Treaudo. At some point during the investigation, Detective Burns learned from Ms. Jackson that the owner of the vehicle involved in the incident was Tasha Jones (“Ms. Jones”), who resided around the corner from Ms. Jackson.
| ^Detective Burns went to Ms. Jones’ residence. She described her vehicle to him. It was not at the location. He said nothing about the homicide, but asked her to whom she had lent her vehicle. Ms. Jones telephoned the driver of her vehicle, Mr. Treaudo, using the speakerphone feature, thus permitting Detective Burns to hear the conversation between Ms. Jones and Mr. Treaudo. Ms. Jones asked the detective to take her to her vehicle after Mr. Treaudo advised her where it was located. The vehicle was located at Alix and LeBouef Streets in Algiers, which is approximately one and one-half blocks from the residence of Mr. Treaudo’s sister. After determining that the vehicle was unoccupied, Detective Burns had it towed to the evidence cage at NOPD headquarters. He also had Ms. Jones transported to the homicide office to give a statement.
That same day, Detective Burns learned of the defendant Michael Allen. He compiled photo lineups and returned to Ms. Jackson’s residence. Ms. Jackson identified Mr. Treaudo as the individual who picked up the victim on the day he was murdered. She could not identify anyone in a second lineup.
During the course of the investigation, Detective Burns showed Ms. Henry separate photo lineups in which she picked out both defendant and Mr. Treaudo, respectively. Ms. Henry knew both men by their given names and by nicknames, “Sun” for Mr. Treaudo and “Mike” for the defendant.[5] Detective Burns also met with Ms. Merritt the day after the murder and displayed two photo lineups to her. She identified only Mr. Treaudo in one lineup.
A white T-shirt was seized from Mr. Treaudo’s residence. No fingerprints taken from the car matched defendant, Mr. Treaudo, or the victim. Detective |7Burns testified that he arrested Mr. Treaudo on June 11, 2009. When he advised Mr. Treaudo of his rights, Mr. Treaudo waived them and gave a statement. The detective identified State Exhibit 29 as an audiotape of that statement.
Detective Burns confirmed on cross examination that on the day of the killing Ms. Henry never saw the defendant, Mr. Treaudo, or the victim. However, the victim told Ms. Henry on the phone that he *729 was with “Sun” and “Mike” shortly before his death, and the victim continued to talk to Ms. Henry until 12:17 p.m., approximately sixteen minutes before he was shot and killed. Detective Burns confirmed that a pair of Timberland boots was seized during the investigation because he received information that the defendant had worn Timberland boots during the murder. He said the defendant was wearing a pair of boots when arrested that had a red substance on them, and that another pair of boots was seized from his residence; neither pair of boots had blood or human DNA on it. No evidence was retrieved from the white T-shirt recovered as evidence from the defendant’s residence. Detective Burns testified that fingerprints found on and in Ms. Jones’ teal-colored Chevrolet Tahoe were matched to some individuals; those individuals were never developed as suspects. The detective confirmed that there was no physical evidence connecting the defendant to the murder. Detective Burns confirmed that Ms. Merritt was the only witness on the scene, in the area where the murder occurred.
NOPD Sergeant Nicholas Gernon, then a homicide detective, participated in the arrest of Mr. Treaudo on June 11, 2009. Mr. Treaudo was lying on a couch when found in a residence at 3630 Frenchmen Street. Detective Gernon lifted up the couch cushions and discovered a .45 caliber High Point semi-automatic pistol, along with a bottle of cleaning oil and a cell phone. The leaseholder of the | ¿residence indicated that she did not know where the gun came from, nor was she aware it was there.
The State and the defense stipulated that Kenneth Leary was qualified as an expert in firearms and ballistics; that he examined the firearm recovered from the residence where Mr. Treaudo was arrested; that he examined the bullet fragments recovered from the scene and the body of the victim; that one of the bullet fragments recovered from the scene was consistent with the .38 caliber class of ammunition; that two of the other fragments recovered exhibited rifling characteristics similar to those on the fragment identified as consistent with the .38 caliber class of ammunition; and that the firearm recovered at the time of Mr. Treaudo’s arrest did not fire any of the bullets, fragments of which were found at the scene and in the body of the victim.
Cynthia Gardner, M.D., qualified by stipulation as an expert in the field of forensic pathology, testified that she performed an autopsy on Mr. Brown at the Orleans Parish Coroner’s Office. Toxicology testing on a sample of Mr. Brown’s blood revealed a metabolite of the prescription drug Valium, what she described as a slight central nervous system depressant. Mr. Brown sustained five gunshot wounds to the head/face, with three bullets exiting and two being retained. He also had one gunshot wound to the left shoulder that exited and one gunshot wound to the left hand that also exited. Two of the five gunshot wounds to the face were fired from a distance of no farther than two feet away. Dr. Gardener identified two bullets she recovered from Mr. Brown’s head and a bullet that was present in the t-shirt.
NOPD Homicide Detective Robert Long assisted Detective Burns on the night of the killing, June 7, 2009. He transported Ms. Jones, the owner of the |9vehicle involved, to the homicide office, where he and his partner, Homicide Detective Michael McCleery[6], interviewed her and presented her with two photo lineups. He identified the two lineups he presented to Ms. Jones. She identified a photo in State *730 Exhibit 37 as being Mr. Treaudo and a photo in State Exhibit 38 as being defendant. Detective Long replied in the affirmative when asked whether Ms. Jones told him why she selected the individuals in the lineups. Detective Long stated on cross examination that the basis of the interview was to determine to whom Ms. Jones might have loaned her vehicle. Detective Long said that to his knowledge she did not witness the killing. He replied in the negative when asked whether, as far he knew, Ms. Jones had any idea who was inside of her vehicle at the time of the murder or even immediately prior to the murder.
Detective Long testified on redirect examination that Ms. Jones identified Mr. Treaudo as the person to whom she loaned her vehicle and the defendant as the person Mr. Treaudo was going to pick up.
Ms. Jones testified at trial that she had a prior conviction in 1995 for possession of stolen property and one in 2009 for attempted theft, which was a reduced charge. She stated that she was not testifying because she received a reduced charge in the 2009 case but that she was testifying because the state called her; she did not really want to be there. She identified a photo of the back of her 2007 Chevy Tahoe, license plate number “RFP 709.” Ms. Jones testified that she met Mr. Treaudo through the defendant about a year prior to the homicide. She knew the defendant as “Stank” and also by “Big Mike.” She knew Mr. Treaudo as “Little Mike.” Ms. Jones used to see Mr. Treaudo and the defendant together all | 10the time. She had loaned her Tahoe to Mr. Treaudo on June 6, 2009, telling him to have it back by 11:00 p.m., as she was planning on going out in it. However, she fell asleep, not awakening until the next morning, Sunday, June 7, when she discovered that her Tahoe was not at her residence. Mr. Treaudo returned to Ms. Jones’ home that same morning. While at her home, Mr. Treaudo answered Ms. Jones’ cell phone in her presence, and after he disconnected the phone call, he borrowed Ms. Jones’ Tahoe once again and left.
Ms. Jones testified that later the same day, June 7, a detective knocked on her door and asked the whereabouts of her vehicle. She told him Mr. Treaudo had it. The detective asked her to call Mr. Treau-do and find out where her Tahoe was. She called Mr. Treaudo, who told her that he had parked her Tahoe around his sister’s residence. She drove with the detective to Mr. Treaudo’s sister’s residence where they found the Tahoe; she commented that the Tahoe had been washed since she had last seen it. The detective exited his car and approached the Tahoe. He did not tell her why he wanted her Tahoe until he returned to his vehicle.
Ms. Jones stated that she knew Mr. Brown from the neighborhood as “Rat Rat.” She confirmed that Mr. Brown knew the defendant and Mr. Treaudo. While at the police station Ms. Jones received a telephone call from Mr. Treaudo’s sister. Ms. Jones told her she was at the police station and that the police were saying that the defendant and Mr. Treaudo had killed “Rat Rat.” Ms. Jones identified her handwriting on the respective photo lineups in which she had identified Mr. Treau-do as the person to whom she had lent her truck on June 7, 2009, and the defendant as the person whom Mr. Treaudo told her he was going to pick up that day.
In Ms. Jones stated on cross examination that on June 7, 2009, Mr. Treaudo asked her if he could borrow her Tahoe to pick up the defendant, but she replied in the negative when queried whether she knew if Mr. Treaudo had, in fact, picked anyone up.
*731 Ms. Henry testified that she had a prior conviction from 2007 for distribution of crack cocaine and another one for theft. She confirmed that Mr. Brown was the father of her child. She said Mr. Brown telephoned her about 9:30 a.m. on June 7, 2009, but she missed that call. She had several missed calls from him before she called him back. He told her he was across the river, meaning the east bank of New Orleans with “Sun” and “Mike.” He said that if he made it back in the “Cut Off” he would meet her in the park. She said that five or ten minutes later (she subsequently said it was not even a minute or two later) she was outside when she heard her mother screaming inside. Ms. Henry ran inside and asked what happened. Her mother told her nothing had happened, to just stay there and that she would be back. Approximately ten minutes later (she estimated ten to twenty minutes on cross examination) some guy and a white boy pulled up and told her that they just found “Rat” dead.
Ms. Henry testified that a detective later met with her. She gave a statement, was shown two photo lineups and asked to identify the two people Mr. Brown told her over the telephone were in the vehicle with him minutes before he was killed. She identified Michael “Sun” Treaudo in the photo lineup marked State Exhibit 21, and the defendant, Michael “Mike” Allen, in the photo lineup identified as State Exhibit 20. She had known Mr. Treaudo her entire life and she estimated she had known the defendant from the neighborhood for five or six years. Ms. Henry conceded that she identified the photos of the defendant and Mr. Treaudo as the | ^individuals who the victim told her were in the vehicle with him shortly before his death. She confirmed that when she testified at Mr. Treaudo’s trial she never mentioned anything about the defendant.
Ms. Henry replied in the negative when asked on redirect examination whether anyone had questioned her about the defendant during the course of Mr. Treau-do’s trial (which resulted in a hung jury). A portion of Ms. Henry’s June 8, 2009 recorded statement to police was played for the jury, in which she said that when the victim called her he said: “I’m in a car with Sun’ and Mike’ goin’ across the river.” The prosecutor asked Ms. Henry about defense counsel having questioned her regarding there being “a lot of Mikes out there.” Ms. Henry said she knew Mr. Brown meant that he was with the defendant because Mr. Treaudo and the defendant were always together. She said when Mr. Brown said he was with “Sun” and “Mike,” she knew “exactly who he was talking about.”
Mr. Treaudo testified on behalf of the State. He confirmed that he had originally been charged in the instant case but had pleaded guilty to manslaughter and received a seven-year sentence. He admitted to three other prior felony convictions — two for unauthorized use of a motor vehicle and one for possession of crack cocaine. Mr. Treaudo knew the defendant, whom he called “Mike,” for approximately ten years, as of June 2009. He knew Mr. Brown his entire life. Mr. Treaudo stated that in June 2009, he was living with Ms. Jones and at other times with Latoria Carter (“Ms. Carter”).
Mr. Treaudo testified that he saw the defendant on Saturday, June 6, 2009, and that the defendant talked about drop-pingdosing two hundred dollars, which he believed “Rat Rat” picked up. He confirmed that he borrowed Ms. Jones’ bluish-green Tahoe on the night of June 6, 2009. He was supposed to take it back to her |isthat night, but he fell asleep, and she must have also. Mr. Treaudo slept at the residence of Angela Woolridge (“Ms. Wool- *732 ridge”) that night. He returned the Tahoe to Ms. Jones’ residence the next morning. He was at Ms. Jones’ residence on June 7, 2009, when the defendant called him on a cell phone, asking Mr. Treaudo to pick him up at his girlfriend’s home. He picked up the defendant. The defendant said he wanted to procure some marijuana at “Rat Rat’s” residence. They drove there, but “Rat Rat” was in the shower. When “Rat Rat” came outside, he told them he knew who had marijuana. When “Rat Rat” went to get into the Tahoe, the defendant got out of the front seat and told “Rat Rat” to get in the front. The person who was supposed to have the marijuana was not home, so the three men drove to the home of Mr. Treaudo’s uncle looking for marijuana, but he was not home either. Mr. Treaudo said the defendant must have received a phone call, because he asked Mr. Treaudo to take him to eastern New Orleans to drop off some money to a girl.
Mr. Treaudo testified that when they got on the bridge going across the river he talked to a girlfriend, Ms. Carter (on a cell phone), while “Rat Rat” also talked to someone (on a cell phone). The defendant directed him to take a particular exit, and they ended up on a street that was one way in and one way out. At some point the defendant directed Mr. Treaudo to stop, near a little U-turn. All three men exited the vehicle. Mr. Treaudo said he was still talking to Ms. Carter when he exited the Tahoe. As he hung up with Ms. Carter, he went around the back of the Tahoe only to see the defendant shoot “Rat Rat” in the head with a black revolver. He had not heard either “Rat Rat” or the defendant say anything before the shooting. Mr. Treaudo scrambled to get back into the Tahoe and heard four more shots. The defendant got back in the car, and Mr. Treaudo asked him why he shot 1 uhim. The defendant replied: “You either rolling with me or you can roll with him.” Mr. Treaudo told the defendant he was “tripping,” and the defendant directed him to pull off. Once they got on I — 10, the defendant told Mr. Treaudo to keep his mouth shut and that he better not say anything. Mr. Treaudo confirmed that he told police he hung up the phone on Ms. Carter right before the shooting, but later learned that he had not disconnected the call.
Mr. Treaudo said he dropped the defendant off at a female’s residence, with a name beginning with the letter “J.” Mr. Treaudo said that as they had crossed the river, the defendant removed the spent cartridge casings from the revolver and threw them in the river. Mr. Treaudo said his sister called him while he was still in the Tahoe, asking him who killed Mr. Brown. He told her not to call him if she did not know what really happened. She told him the police were looking for him. He parked the Tahoe approximately four blocks from his sister’s residence. Ms. Jones called him asking where her Tahoe was, and he told her. He said that before he left the Tahoe he wiped the steering wheel down, along with where “Rat Rat” and the defendant had been sitting. He said he did that because he was nervous and scared, and he did not know what to do.
Mr. Treaudo said the police found him at Ms. Woolridge’s residence four or five days after the murder and arrested him. He waived his rights and gave a statement on June 11, 2009. Mr. Treaudo testified that the defendant had come to Ms. Wool-ridge’s residence after the killing. Mr. Treaudo asked him why he shot “Rat Rat,” and the defendant complained that he knew “Rat Rat” had picked up two hundred dollars he had dropped. He said the defendant tried to get him to come back across the river, but he told him that he was going to stay at Ms. Woolridge’s *733 home. When asked why he had not wanted to go back with the | ^defendant across the river, Mr. Treaudo stated that was afraid for his life, and that he felt the defendant would do something to him since he was the only person who knew what happened.
Mr. Treaudo stated that after the defendant was arrested, the defendant telephoned him from jail and asked him to break Ms. Jones’ phone, so Mr. Treaudo broke the phone and threw it in the street. He confirmed that was the same phone he was talking on at the time of the shooting. Mr. Treaudo said he was telling the truth, and that he had pleaded guilty because he did everything the defendant told him to do and felt responsible for “Rat Rat’s” death. The transcript of the June 11, 2009 phone call by the defendant from jail reflects that the defendant asked Mr. Treau-do if he “threw that phone away,” and that Mr. Treaudo replied that he had “cracked” it.
Mr. Treaudo admitted on cross examination that he had already been tried in the case concerning the murder of Mr. Brown which ended with a hung jury, and that was when he decided to take the plea bargain deal. He knew that if he was convicted of second degree murder he would never get out of prison. He had also been told that a witness had picked him out as leaving the scene of the murder. Mr. Treaudo also admitted that the State agreed not to charge him as a habitual offender. He denied ever being charged with a firearm violation for a gun found under the sofa at Ms. Woolridge’s residence. Mr. Treaudo claimed he did not know the defendant had a gun on the day of the killing.
Ms. Carter believed she had prior misdemeanor convictions for marijuana and theft. Ms. Carter knew Mr. Treaudo her entire live. She had known the defendant a few years. She described Mr. Treaudo and the defendant as “best buddies,” and confirmed that she would see them hanging out together a lot. Ms. |16Carter testified that Mr. Treaudo telephoned her on June 7, 2009, and she was on the phone with him for five or six minutes. Towards the end of that phone call she heard silence, followed by five or six gunshots, followed by Mr. Treaudo asking: “Man, what the f — k you did that for?” She then heard a voice say: “N-r, you either with me or you with this n-r?” She then heard Mr. Treaudo say: “Man, f — k.” Mr. Treaudo said nothing to her after she heard the gunshots.
On cross examination, Ms. Carter confirmed that she and Mr. Treaudo were talking and that he left the phone open. After she heard the gunshots, he did not respond to her anymore. Ms. Carter stated on redirect examination that Mr. Treau-do was hollering when he said: “Man, what the f-k you did that for?” She confirmed that Mr. Treaudo sounded surprised.
Don Hancock (“Mr. Hancock”) testified that he was the telephone supervisor for the Orleans Parish Sheriffs Office, and that he oversaw operations of all telecommunications equipment at the sheriffs office, including an inmate telephone station. He stated that all inmate telephone calls were recorded digitally. He said that when an inmate makes a call, he has to use his pin number or folder number issued at booking, and that upon acceptance of the call by the receiver there is an announcement to both parties that the calls are subject to monitoring and recording. Mr. Hancock identified a CD he downloaded of telephone calls for the defendant from June 10, 2009 through June 20, 2009. He also identified transcripts of those calls. He testified that he verified that the transcripts corresponded with the calls, and *734 that the transcripts accurately reflected what was said on the jail call recordings. The recordings were played for the jury, and the transcripts of the calls were provided to jurors. A June 11, 2009 call transcript |17reflects defendant asking Mr. Treaudo if he “threw that phone away,” and that Mr. Treaudo replied that he had “cracked” it.
Ms. Henry, recalled as a witness by the defense, was confronted with her testimony given at the trial of Mr. Treaudo, relative to whom Mr. Brown told her he was with during a phone call between them shortly before he was murdered. She testified that Mr. Brown told her “I’m with Sun.” The prosecutor then asked Ms. Henry, during Mr. Treaudo’s trial: “Who did you say he was with?” And Ms. Henry replied: “Sun.” On cross examination by the prosecutor, Ms. Henry was asked whether anyone had asked her during her testimony at Mr. Treaudo’s trial who else had been in the vehicle other than “Sun.” She replied in the negative. She also confirmed that she told a detective in her June 8, 2009 recorded statement given the day after the murder that Mr. Brown told her he was with “Sun” and “Mike,” as was verified by playing the recorded statement for the jury.
During redirect examination, Ms. Henry replied in the affirmative when asked whether she had been asked while testifying at Mr. Treaudo’s trial “who was in the car,” and that the only answer she had given was “Sun.”
ERRORS PATENT
A review of the record reveals no errors patent on the face of the record.
The defendant cites as an error patent that the trial court erred in failing to advise the defendant of his right to post-conviction relief and the time limit within which to file for such relief. However, this is a reference to La.C.Cr.P. art. 930.8(C), which states that at the time of sentencing the trial court shall inform the defendant of the prescriptive period for post-conviction relief, either verbally or in writing. However, La.C.Cr.P. art. 980.8(C) is supplicatory language that does not bestow an enforceable right in favor of an individual defendant. State v. Brumfield, 2009-1084, pp. 1-2 (La.9/2/09), 16 So.3d 1161, 1162; see also State v. Reel, 2010-1737, pp. 14-15 (La.App. 4 Cir. 10/3/12), 126 So.3d 506, 517, 2012 WL 4711881, writ denied, 2012-2433 (La.4/12/13), 111 So.3d 1018 (The failure of a trial court to inform the defendant of the time period within which to petition for post-conviction relief is not an error and requires no action on the part of an appellate court.).
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error the defendant argues that the evidence was insufficient to support his conviction. The defendant was convicted of second degree murder, defined in pertinent part by La. R.S. 14:30.1(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 *735 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
| ]9In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay, 2000-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
When the identity of the defendant as the perpetrator is disputed, the State must negate any reasonable probability of mis-identifieation in order to satisfy its burden under Jackson v. Virginia, supra. State v. Galle, 2011-0930, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935; State v. Everett, 2011-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619, writs denied, 2012-1593, 2012-1610 (La.2/8/13), 108 So.3d 77.
In the defendant’s sufficiency argument he attacks the credibility of Mr. Treaudo. However, “a reviewing court is not called upon to decide whether it believes the witnesses.... ” Huckabay, supra, quoting State v. Smith, 600 So.2d 1319, 1324 (La.1992). A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306.
|2oConsidering the facts of this case detailed hereinabove, and viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was the individual who shot and killed the victim while having the specific intent to kill or to inflict great bodily harm upon him. There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2
In this assignment of error, the defendant argues that the trial court erred in admitting evidence of his involvement in the 2004 block party shooting. As noted above, the State sought to introduce evidence of the 2004 shooting in connection *736 with its Prieur motion, in order to show motive, preparation, or plan.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The Louisiana Supreme Court set forth the applicable law in State v. Rose, 2006-0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236, 1243-1244, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or 12iaccident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2, (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of pri- or misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”). (Footnote omitted).
Mr. Treaudo testified that he was at the 2004 block party at “Rat Rat’s” mother’s house. He stated that “Rat Rat” was standing in front of “his” door, presumably meaning his mother’s door, where he was living, when shots were fired at “Rat Rat” and another male. Mr. Treaudo confirmed *737 that someone named “Jaeque” was also shooting at “Eat Rat” at the block party. When asked if “Jacque’s” name was really “Wayne Charles,” Mr. Treaudo said “probably so.” When asked if “Jaeque Wayne Charles” had any beef with “Rat Rat,” Mr. Treaudo replied not that he knew of.. He denied that “Jaeque Wayne Charles” was the individual he picked up, as defense counsel phrased it, “when you two guys went out there to murder Arthur Brown.”
Ms. Henry testified at trial, as she had at the Prieur hearing, that she and Mr. Brown were standing across the street from the Mr. Brown’s mother’s home when | pashots were fired toward the home from a car driving down the street. She stated that the shots were fired away from them. She also stated that she observed the defendant in the driver’s side, back seat of the car from which the shots were fired. She never informed the police that the defendant was involved in the shooting.
Tyrone Phillips identified the defendant as one of the males who jumped out of the car at the 2004 block party and fired shots. Mr. Phillips testified that at the time of this shooting he was standing next to his cousin, Jonathan Bush, who was shot and wounded. Mr. Phillips said that, while Mr. Brown had been standing within sight of him, Mr. Brown was not around when the shots were fired. Mr. Phillips identified the defendant in a six-photo lineup as the individual who committed the shooting. Mr. Phillips talked to the police on the night of the shooting, but never talked to them about it again. When asked whether he had any prior convictions, Mr. Phillips replied not that he knew of. Mr. Phillips conceded on cross examination that he might have had a 1998 conviction for simple burglary, but said that he did not remember.
NOPD Detective John Duzac investigated the 2004 Kent Drive shooting. Detective Duzac identified the defendant in court. He also identified State Exhibit 1 as a copy of the photo lineup he presented to Mr. Phillips, who he said had identified photo number five, the defendant’s photo, as depicting the shooter. Detective Duzac maintained that he obtained an arrest warrant for the defendant in connection with 2004 shooting. Detective Duzac stated that the defendant was never convicted of nor pleaded guilty to the 2004 Kent Drive shooting. He did not know whether the defendant had ever been indicted, although he stated that he “charged” the defendant. When asked whether Mr. Brown was ever shot on that scene, Detective Duzac said he did not recall the name, Arthur Brown. The | ^detective said the victim in the 2004 shooting was unable to identify anyone, and he confirmed that Mr. Phillips was the only person who came forward, made an identification, and gave a statement.
NOPD 911 operator Yolanda Haynes identified a 911 incident recall and a corresponding audiotape recording of the call, under NOPD item number G-19738-04. Ms. Haynes replied in the negative when asked on cross examination whether she saw the names Arthur Brown or Michael Treaudo in the incident recall.
The defendant is correct that the testimony of the three eyewitnesses to the 2004 shooting diverged on whether shots were fired at Mr. Brown. However, the trial court granted the motion and issued written reasons. Therein, the court stated that two witnesses would testify at trial that in 2004, the defendant committed a drive-by shooting against Mr. Brown. The trial court expressly stated that it had listened to the testimony of Ms. Henry and Mr. Treaudo and found it to be credible and compelling.
The court found that both the instant murder and the 2004 block party shooting involved similar criminal conduct toward *738 the same victim. The court found the evidence relevant to show defendant’s intent, knowledge, and identity. The court also expressly found that evidence of the block party shooting was not outweighed by its prejudicial effect.
A trial court’s ruling on the admissibility under La. C.E. art. 404(B)(1) of other crimes evidence is reviewable under an abuse of discretion standard. See State v. Henderson, 2012-2422, pp. 3-4 (La.1/4/13), 107 So.3d 566, 568 (“[W]e conclude the trial court abused its discretion in finding the defendant’s prior conviction to be inadmissible under LSA-C.E. art. 404(B)(1)”); State v. Barnes, 2011-1421, p. 15 (La.App. 4 Cir. 9/19/12), 100 So.3d 926, 936, writ denied, 2012-2251 (La.4/1/13), 110 So.3d 575; State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220. A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse of discretion. State v. Sanders, 2012-0409, p. 14 (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 630. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Girard, 2012-0790, p. 6 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 691.
Even assuming that the State was required to prove the commission of the prior offense by “clear and convincing evidence” rather than by a preponderance,[7] it cannot be said that the trial court abused its discretion in finding by clear and convincing evidence that the defendant participated in intentionally shooting at either Mr. Brown or toward his mother’s residence at the 2004 block party. It is certainly a reasonable statement that simply having shots fired toward one’s residence in a drive-by shooting during a party at that residence bestows a victim status upon that individual. Despite a difference between the two offenses, it cannot be said that the trial court abused its discretion in rejecting the notion suggested by the defendant that the State introduced evidence of the prior crime simply to show that the defendant was a person of bad character because he was involved in the prior crime, and thus that he probably committed the instant crime. The similarities between the crimes were that the defendant was the perpetrator in the prior violent crime and the alleged perpetrator in the instant violent crime, and Mr. Brown was a victim in some manner in the 2004 crime and the ultimate victim in the instant crime.
|2liEvidence of the prior crime was relevant to establish the defendant’s identity as the individual who shot and killed Mr. Brown some five years after the defendant had participated in the earlier violent crime involving Mr. Brown. The trial court did not abused its discretion in finding that that the probative value of the evidence of 2004 shooting incident was not substantially outweighed by the danger of unfair prejudice to the defendant.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 3
In his third assignment of error the defendant argues that this Court should remand the case for a “determination” of the trial court’s reasoning in denying his request to introduce “evidence of a prior conviction and criminal history” of Jacque Wayne Charles (“Mr. Charles”). Mr. Treaudo testified on both direct and cross examination that one of the shooters at the 2004 block party was named “Jacque.” When asked on cross examination whether “Jacque’s” name was really ‘Wayne Charles,” Mr. Treaudo answered, “proba *739 bly so.” Mr. Treaudo denied that Mr. Charles was “the individual that you picked up when you two guys went out there to murder Arthur Brown, right?”
The defense counsel then asked Mr. Treaudo if he knew that Mr. Charles had a long list of “gun convictions,” which drew an objection from the State. The trial court did not address the objection before defense counsel rephrased it, asking Mr. Treaudo if he knew the individual had been arrested and convicted numerous times for possession of a firearm. At that point the trial court asked counsel to approach the bench, whereupon, the record reflects, an unrecorded bench conference was held. The defense counsel then stated, for the record, and before the jury: “I have his conviction to introduce, but I will move on.”
|2fiAt the close of the State’s case the defense counsel brought up for the record what was discussed during the unrecorded bench conference prompted by defense counsel questioning Mr. Treaudo about prior firearms-related convictions of Mr. Charles. Defense counsel stated for the record that he had attempted to introduce certified prior convictions of Mr. Charles, an individual who the defense was alleging could have been a possible co-perpetrator with Mr. Treaudo. The trial court did not allow the introduction of that evidence. The defense counsel noted that the trial court stated it would make it clear for the record that it was a contemporaneous objection for purposes of appeal.
The defense counsel argued that the defendant had a constitutional right to present a defense. The trial court confirmed for the record that the defense counsel’s objection was to be treated as a contemporaneous one. While the trial court also stated that the defense counsel could proffer the documents and they could be placed into the record, no such evidence is contained in the record. Neither of the two exhibit indexes, for the September 27 or 28, 2011 days of trial, or the minute entries for the days of the trial, reflects that the defense introduced or proffered any evidence during the trial.
The defendant argues that he was deprived of his right to present a defense by the denial of his request to introduce what he represented at trial were “certified convictions” of Mr. Charles, and what he represents in his appellate brief was “evidence of a prior conviction and criminal history” of that individual.
The Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee the criminally accused a meaningful opportunity to present a complete defense. State v. Dressner, 2008-1366, p. 15 (La.7/6/10), 45 So.3d 127, 137; State v. Blank, 2004-0204, p. 49 (La.4/11/07), 955 So.2d 90, 130. However, the right to present a defense does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. Everett, 2011-0714, p. 30, 96 So.3d at 627; State v. Fernandez, 2009-1727, p. 14 (La.App. 4 Cir. 10/6/10), 50 So.3d 219, 229.
A trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. State v. Cyrus, 2011-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565. Also, a trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect under La. C.E. art. 403. State v. White, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204.
*740 In the instant case, the defendant presented evidence — the testimony of Mr. Treaudo, the State’s primary -witness against him — that Mr. Charles was an individual who was with the defendant at the 2004 block party and that Mr. Charles had shot at Mr. Brown. Thus, the fact that Mr. Charles had shot at Mr. Brown at the 2004 block party was established by the same witness the State primarily relied upon to prove beyond a reasonable doubt that it was the defendant who shot and killed Mr. Brown on June 7, 2009.
On appeal the defendant complains that the trial court’s ruling prevented him from presenting evidence of Mr. Charles’ criminal history “and possible involvement in Mr. Brown’s death.” However, it is inaccurate to say that the trial court refused to permit the defendant to present evidence of Mr. Charles’ involvement in Mr. Brown’s death. There was no direct evidence of that fact. It had already been established by the State’s main witness that Mr. Charles shot atj^Mr. Brown in July 2004. Given this known fact, evidence that Mr. Charles may have had a prior arrest and/or conviction for a firearm-related offense was virtually irrelevant to any inference that might have been drawn by the jury that Mr. Charles was involved in Mr. Brown’s June 2009 murder.
While the defendant complains that the trial court did not give any reason for denying him the right to present evidence that Mr. Charles had a prior gun-related arrest and/or conviction, the trial court could have found that, given the circumstances, such evidence was irrelevant and/or that, even if marginally relevant, its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. It cannot be said that such a finding by the trial court was a clear abuse of discretion.
Further, even assuming that the trial court erred in refusing to admit any such evidence, it constituted harmless error insofar as defendant being deprived of his right to present a defense. See State v. Juniors, 2003-2425, p. 55 (La.6/29/05), 915 So.2d 291, 332 (“[Bjecause any error in the exclusion of the letter allegedly written by Williams was clearly harmless, the defendant was not deprived of the opportunity to present a defense.”). The jury obviously believed Mr. Treaudo’s testimony that defendant shot and killed Mr. Brown on June 7, 2009. There is no reason the jury would not have also believed Mr. Treau-do’s testimony that Mr. Charles shot at Mr. Brown in 2004. However, having that information, the jury obviously rejected any suggestion that it was Mr. Charles who killed Mr. Brown in 2009. The guilty verdict rendered in the instant case was surely unattributable to any error by the trial court in barring any marginally relevant evidence of a prior arrest and/or conviction of Mr. Charles for a firearms offense. State v. Higginbotham, 2011-0564, p. 3 (La.5/6/11), 60 So.3d 621, 623 (Harmless error exists where the guilty verdict actually rendered was “surely unattributable” to the error.). There is no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Mr. Treaudo’s surname is spelled "Tru-deaux” in the indictment, but "Treaudo” in the affidavit for the warrant for his arrest, on his arrest register, on his rights-of-arrestee form, in all of his pleadings, and in all minute *726 entries. The Louisiana Department of Corrections also lists his last name as "Treaudo.”

. In connection 'with the murder of Arthur Brown, Mr. Treaudo was initially tried but the trial resulted in a hung jury. Subsequent to this, on February 7, 2011, the State amended the indictment as to Mr. Treaudo to charge manslaughter, to which he pleaded guilty that date and was immediately sentenced to seven years at hard labor.

. State v. Prieur, 277 So.2d 126 (La.1973). The relevant incident in the State's Prieur motion was a 2004 shooting at a block party at 2911 Kent Drive in New Orleans, where the defendant, was identified as the shooter, but never convicted. The State argued that Mr. Brown was also the intended victim in the 2004 shooting. The 2004 incident is addressed below in the defendant’s second assignment of error.

.In Ms. Jackson’s testimony she refers to Michael Treaudo as "Little Mike.”

. Ms. Henry refers to Michael Treaudo as "Sun” and the defendant Michael Allen as "Mike.”

. The transcript refers to the detective as McClary, but the correct spelling is McCleery.

. See discussion at State v. Barnes, supra.